[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Dialysis Ctrs. of Dayton, L.L.C. v. Testa,* Slip Opinion No. 2017-Ohio-4269.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-4269

DIALYSIS CENTERS OF DAYTON, L.L.C., APPELLANT, *v*. TESTA, TAX COMMR., ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Dialysis Ctrs. of Dayton, L.L.C. v. Testa,* Slip Opinion No. 2017-Ohio-4269.]

*Taxation—Charitable-use exemption of real property from taxation—R.C. 5709.12 and 5709.121—Nondiscrimination, rather than quantum of charitable care, is the criterion for charitable-use exemption—Board of Tax Appeals' denial of claim for charitable-use exemption affirmed as to tax year 2006 and reversed as to tax year 2007.*

(No. 2015-0322—Submitted April 4, 2017—Decided June 15, 2017.)

APPEAL from the Board of Tax Appeals, Nos. 2012-138, 2012-139, 2012-140, and 2012-141.

_____

**Per Curiam.**

{¶ 1} Appellant, Dialysis Centers of Dayton, L.L.C. ("DCD"), contests the Board of Tax Appeals' decision affirming the denial of its request for property-tax exemption for its four dialysis-service centers for tax year 2007 and the denial of its requested remission of the property taxes it paid for those facilities for tax year 2006. The BTA upheld the tax commissioner's denial of the exemption on the ground that the record failed to demonstrate a sufficient level of charitable care. Although we hold that remission was properly denied for tax year 2006, we conclude that for tax year 2007, DCD's use of space at the four centers qualified for exemption. However, the record also shows that some space in the facilities was leased to private physicians, so the properties should be split-listed, with a portion taxable and the dialysis-service facilities exempt. We therefore affirm the decision of the BTA as to tax year 2006 and reverse it as to tax year 2007, and we remand the cause to the tax commissioner for determining what portion is exempt.

## I. FACTUAL BACKGROUND

{¶ 2} DCD was formed in 1998 by Miami Valley Hospital and five physicians. The physicians were members, and thereby part-owners, of the company until August 1, 2006, when Miami Valley Hospital became its sole member. Miami Valley Hospital is a nonprofit entity with 26 U.S.C. 501(c)(3) status as a charitable institution ("501(c)(3) entity"). When the hospital became the single member of the limited-liability company, DCD became "disregarded as an entity" for federal-tax purposes. 26 C.F.R. 301.7701-3(f)(2). As a result, its transactions appear on the hospital's tax returns as if DCD were a division of the hospital. 26 C.F.R. 301.7701-2(c)(2); 26 C.F.R. 301.7701-3(b)(1)(ii).[1]

---

[1] Although Miami Valley Hospital's vice president of finance, when testifying at the BTA hearing, was unsure whether DCD filed separate tax returns, the tax commissioner asserted his view both in his BTA brief and his brief to this court that DCD is a "disregarded entity" for federal-tax purposes.

**{¶ 3}** Each of the four properties at issue was improved with a building at which DCD provided dialysis services in 2006 and 2007. In order to be treated at one of the facilities, a person needed a referral from either a hospital or a private physician. When a new patient was referred to DCD, either a hospital caseworker or a DCD employee would evaluate the patient's options for paying for the treatment. Potential sources of payment, other than the patient himself, were Medicare, Medicaid, and insurance. If an indigent patient had no insurance, DCD attempted to obtain coverage for the person through Medicare or Medicaid. If a patient had to pay a portion or all of the costs, DCD had the patient fill out a form to determine whether he qualified for charitable care. Although DCD pursued all payment options, including private insurance, Medicare, and Medicaid, it treated all patients, regardless of whether the treatment would be covered by a third party or whether the patient could afford the treatment costs.

**{¶ 4}** DCD's operating agreement that became effective on August 1, 2006, states that the "charitable purpose" of DCD is to, among other things, "provide services to indigent patients regardless of their ability to pay." At the BTA hearing, Miami Valley Hospital's vice president of finance, who had formerly been the board chairman of DCD, was asked whether DCD would treat "any patient that walks in the door," and he responded, "We see everybody."

**{¶ 5}** The tax department requested that DCD quantify the amount of "uncompensated care" provided, defining that term to exclude write-offs of bad debt. DCD stated that in 2007, it provided "approximately $435,000 in Charity Care of approximately 150 patients (28% of total patients treated)."

**{¶ 6}** Some space in the properties at issue was leased to "Renal Physicians, Inc." or "Renal Partners II, Inc." One lease began in 1992, another in 1995, and a third in 1998. Starting rent varied from $1.25 per month per square foot to $13.95 per month per square foot; under one contract, the rent was to increase over time. The physician/medical directors at the clinics were independent contractors, and

the leased space was for those physicians' offices, not for patient visits. It was not clear from the testimony whether all four properties were encumbered by such leases.

**{¶ 7}** DCD filed its four exemption applications in November 2007, one for each of the properties at issue. By final determinations issued November 16 and November 21, 2011, the tax commissioner denied exemption for the primary reasons that the evidence indicated that no more than minimal charitable care was provided at the sites and DCD itself was a for-profit entity. In BTA Nos. 2012-139, 2012-140, and 2012-141—but not BTA No. 2012-138—the final determinations also relied on the fact that DCD leased some of its space to private physicians.

**{¶ 8}** DCD separately appealed the four final determinations to the BTA, which consolidated the cases for hearing and decision. At the BTA hearing, DCD offered the testimony of its former board chairman, who at the time of the hearing was the vice president of finance of Miami Valley Hospital. Several exhibits were admitted: DCD's August 2006 operating agreement and the Form 990 tax reports of Miami Valley Hospital for tax years 2005 through 2008.

**{¶ 9}** The BTA issued its decision in the four matters on January 27, 2015. In its decision, the BTA relied on the paucity of evidence of charitable care at the locations, concluding that "[i]n the absence of more evidence [of charitable care]" it could not determine how much, if any, such care was provided at the sites. BTA Nos. 2012-138, 2012-139, 2012-140, and 2012-141, 2015 WL 731728, *3 (Jan. 27, 2015). On that basis, the BTA affirmed the broad denial of exemption. DCD appealed to this court.

## II. ANALYSIS

### A. Standard of Review

**{¶ 10}** In reviewing decisions of the BTA, we determine whether the board's decision is "reasonable and lawful." R.C. 5717.04; *Satullo v. Wilkins*, 111

Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14.  Although the BTA is responsible for determining factual issues, the court " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' "  *Id*., quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001).

**B. Because Private Physicians Were Members of DCD on the 2006 Tax-Lien Date, DCD Is Barred from Exemption for 2006**

**{¶ 11}** DCD's exemption application seeks exemption for 2007 and requests remission for tax year 2006.  As indicated, the record shows that until August 1, 2006, private physicians owned a percentage of DCD.  Thereafter, the hospital was the sole member of DCD.

**{¶ 12}** The status of real estate as taxable, or as exempt from taxation, is to be determined based on the use of the property on the tax-lien date, January 1. *Sylvania Church of God v. Levin*, 118 Ohio St.3d 260, 2008-Ohio-2448, 888 N.E.2d 408, ¶ 6-7.  Because on January 1, 2006, the private physician were co-owners of DCD and exercised their ownership interest as part of a profit-making medical practice, the BTA properly denied remission for tax year 2006.  Under those circumstances, the provision of dialysis services cannot be construed as constituting an exclusive charitable use of the property given that some of the owners used the property with a view to profit.  *Accord White Cross Hosp. Assn. v. Bd. of Tax Appeals*, 38 Ohio St.2d 199, 311 N.E.2d 862 (1974) (no exemption when nonprofit hospital leased to for-profit physicians); *Anderson/Maltbie Partnership v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547 (no exemption when for-profit landlord leased to community school).

**C. For Tax Year 2007, the Exemption Should Be Granted for Space that Was Used for Dialysis Services and Was Not Leased to Private Physicians**

*1. Nondiscrimination, rather than quantum of charitable care, is the criterion for exemption*

**{¶ 13}** After the hospital, a 501(c)(3) entity, became the sole owner of DCD, DCD qualified as an entity operating on a charitable basis to the extent that it provided service regardless of a patient's ability to pay, in accordance with its operating agreement.  R.C. 5709.12(B) provides an exemption from taxation for "[r]eal and tangible personal property belonging to institutions that is used exclusively for charitable purposes."  Under that provision, it is only the owner's use of the property—not the use by a lessee or licensee of the owner—that is considered when determining whether the property is used for charitable purposes. *First Baptist Church of Milford, Inc. v. Wilkins*, 110 Ohio St.3d 496, 2006-Ohio-4966, 854 N.E.2d 494, ¶ 12-13, citing *Zangerle v. State ex rel. Gallagher*, 120 Ohio St. 139, 165 N.E. 709 (1929), and *Lincoln Mem. Hosp., Inc. v. Warren*, 13 Ohio St.2d 109, 235 N.E.2d 129 (1968).

**{¶ 14}** For purposes of Ohio's charitable-use property-tax exemption, "the provision of medical or ancillary healthcare services qualifies as charitable if those services are provided on a nonprofit basis to those in need, without regard to race, creed, or ability to pay." *Church of God in N. Ohio v. Levin*, 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 19, citing *Vick v. Cleveland Mem. Med. Found.*, 2 Ohio St.2d 30, 206 N.E.2d 2 (1965), paragraph two of the syllabus.  This court has repeatedly allowed the charitable-use exemption in cases in which the evidence shows that a substantial amount of the cost of care was paid by the patients themselves.  *See Vick* at 33 ("the facts that the hospital charges patients who are able to pay for its services and that a surplus has been created in the hospital fund (no part of which has been diverted to a private profit) do not change its essentially charitable nature"), citing *Goldman v. Friars Club*, 158 Ohio St. 185, 107 N.E.2d

518 (1952); *Taylor v. Protestant Hosp. Assn.*, 85 Ohio St. 90, 96 N.E. 1089 (1911); and *O'Brien v. Physicians Hosp. Assn.*, 96 Ohio St. 1, 116 N.E. 975 (1917), paragraph five of the syllabus. In the era of insurance and government health-care benefits, care may be paid for by third-party payors without destroying charitable status. *See Dialysis Clinic, Inc. v. Levin*, 127 Ohio St.3d 215, 2010-Ohio-5071, 938 N.E.2d 329, ¶ 26, 42; *accord Rural Health Collaborative of S. Ohio, Inc. v. Testa*, 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, ¶ 34.

### 2. *Proof of specific level of unreimbursed care is unnecessary*

**{¶ 15}** In *Dialysis Clinic*, we specifically discounted the importance of showing a particular level of charitable care. In that case, the tax commissioner argued that the exemption applicant had to show that it had furnished services to those who lacked sufficient assets or insurance, and in order to make that showing, the commissioner argued, the exemption applicant had to "show that it [had] provided unreimbursed care—that is, care financed by [the applicant] itself from funds derived either from charitable donations or operating surpluses." *Dialysis Clinic* at ¶ 38-39. We rejected that argument, observing that the existence of Medicare and Medicaid means that "few patients actually receive free care that is wholly unreimbursed," and we held that "[a] threshold amount of unreimbursed care is not required." *Id.* at ¶ 40. Next, we distinguished the cases cited by the tax commissioner, and we articulated the principle derived from one of those cases as follows: "the modern healthcare provider is not required to forgo the pursuit of [Medicare and Medicaid] benefits to qualify for charitable status." *Id*. at ¶ 42.

**{¶ 16}** A crucial factor in the charitable status of property use is whether a facility is open to serve the general public—or to that part of the general public that has a special need—in order to cater to the needs of that whole segment of the public. *See Bethesda Healthcare, Inc. v. Wilkins*, 101 Ohio St.3d 420, 2004-Ohio-1749, 806 N.E.2d 142, ¶ 32 ("charity" is " 'the attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit

*mankind in general, or those in need of advancement and benefit in particular
 * * * without hope or expectation of gain or profit' "* [emphasis added]), quoting
*Planned Parenthood Assn. v. Tax Commr.*, 5 Ohio St.2d 117, 214 N.E.2d 222,
paragraph one of the syllabus; *accord The Chapel v. Testa*, 129 Ohio St.3d 21,
2011-Ohio-545, 950 N.E.2d 142, ¶ 13-14 (opening property up to recreational use
by the general public constitutes a charitable use of property); *O'Brien*, 96 Ohio St.
at 4, 116 N.E. 975 (property was held charitable and exempt that was used "as a
public hospital, open at all times to the public, regardless of color, and [was] at the
service of any reputable physician of any school of medicine to the extent of its
facilities"). This factor accounts for the emphasis in *Bethesda* on the number of
free memberships given out: because the fitness center at issue in *Bethesda* could
be used only by those who were members, the fact that free memberships were
given to some who could not afford the dues was the only basis upon which the
property owner could rely in asserting that the facility afforded service to the
general public. By contrast, the facilities at issue here are open to all referred
patients in need of the services that they provide.

{¶ 17} In *Rural Health Collaborative*, 145 Ohio St.3d 430, 2016-Ohio-508,
50 N.E.3d 486, the record demonstrated that because the dialysis clinic at issue
accepted Medicare patients, it was limited in its options in exempting patients from
payment obligations. *See id*. at ¶ 10-11 (Medicare regulations prohibit a
straightforward waiver of co-insurance). Here, DCD's attempt to obtain third-party
reimbursement on a patient-by-patient basis can be interpreted as a prudent and
diligent use of charitable assets: donated funds should be applied to patient care
only when payment is otherwise unavailable.

{¶ 18} For these reasons, we agree with DCD that the excessive focus by
the tax commissioner and the BTA on the quantum of charitable care is reversible
legal error. As a result, for tax year 2007, the facilities at issue should be generally
exempted, with the exception of those areas leased to private physicians.

### D. Leased Physician Offices Should Be Split-Listed as Taxable

{¶ 19} As discussed above, at least three of the four properties include office space that is leased to physicians. The case law clearly provides that space leased by a charitable institution to private physicians for their practices does not qualify for exemption. *White Cross Hosp. Assn.*, 38 Ohio St.2d at 201, 311 N.E.2d 862 (1974) (upholding denial of exemption where BTA found that the hospital's office building "was used as a place 'in which the tenant-physician conducts and furthers his own private practice, paying competitive rental therefor' ").[2] Moreover, the plain language of R.C. 5709.121 would not permit exemption to the leased premises under these circumstances. First, the leases negate the exercise of "direction and control" by DCD over the space, which defeats exemption under R.C. 5709.121(A)(2). Second, the private physician practices are presumptively for profit, which defeats exemption under R.C. 5709.121(A)(1) as well as under R.C. 5709.121(A)(2).

{¶ 20} R.C. 5713.04 provides that if property is used partly for exempt and partly for taxable purposes, the listing should be split, with part treated as exempt and part as taxable. This usually involves a division of the property according to use by acres or square feet. *See, e.g., The Chapel*, 129 Ohio St.3d 21, 2011-Ohio-545, 950 N.E.2d 142, at ¶ 28-29 (cause remanded for determination of acreage subject to exempt use). The burden was on DCD, as the applicant for the exemption, to show the extent to which the premises were not leased to private physicians. *See Anderson/Maltbie Partnership*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, at ¶ 16 (burden is on the taxpayer to show that the language of the exemption statute clearly expresses exemption in relation to the facts of the claim). But the tax commissioner's conviction that the exemption should be

---

[2] We discussed the relationship between R.C. 5709.12(B) and 5709.121 at greater length in *Rural Health Collaborative*, 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, ¶ 20-22, and we incorporate that discussion by reference into this opinion.

broadly denied kept the parties from focusing on the facts concerning the leases. We therefore reverse the BTA's decision as to tax year 2007, and we remand the cause to the tax commissioner, instead of to the BTA, because our reversal of the broad denial of the exemption "effect[s] a change of circumstances in such a way that the determination of [the] taxpayer's claim [here, as to the leased spaces] should begin anew" before the tax commissioner, *Epic Aviation, L.L.C. v. Testa*, 149 Ohio St.3d 203, 2016-Ohio-3392, 74 N.E.3d 358, ¶ 37.

**{¶ 21}** The leases in the record set forth the square footage subject to lease, but clarification can be provided on remand as to the status of the leases as of the tax-lien date, January 1, 2007, as well as supplementation of the record for the purpose of permitting a proper determination of the square footage subject to a lease at each facility as of the tax-lien date. Accordingly, we remand to the tax commissioner for a determination, based on the existing record and any additional evidence, of the space leased to private physicians on the tax-lien date, and with the instruction that that space remain on the taxable list for tax year 2007 while the remainder of the dialysis facilities are exempted.

### III. CONCLUSION

**{¶ 22}** For the foregoing reasons, we affirm the BTA's denial of remission for tax year 2006 and reverse the denial of exemption for tax year 2007, and we remand the cause to the tax commissioner for further proceedings in accordance with this opinion.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FRENCH, O'NEILL, FISCHER, and DEWINE, JJ., concur.

O'DONNELL, J., concurs in part and dissents in part and would affirm the Board of Tax Appeals' decision to deny exemption for tax year 2007.

_____

10

Rogers & Greenberg, L.L.P., James G. Kordik, Cynthia L. Westwood, and Channing M. Kordik, for appellant.

Rich & Gillis Law Group, L.L.C., Mark H. Gillis, and Kelley A. Gorry, for appellee West Carrollton City School District Board of Education.

Michael DeWine, Attorney General, and Daniel W. Fausey and Raina M. Nahra, Assistant Attorneys General, for appellee Tax Commissioner.

_____